918 A.2d 626 (2007)
391 N.J. Super. 352
STATE of New Jersey, Plaintiff-Respondent,
v.
Adam J. KENT, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 2007.
Decided March 22, 2007.
*627 Evan M. Levow argued the cause for appellant (Levow & Costello, attorneys; Mr. Levow and Kevin Leckerman, Cherry Hill, on the brief).
Christopher W. Hsieh, Senior Assistant Prosecutor, argued the cause for respondent (James F. Avigliano, Passaic County Prosecutor, attorney; Mr. Hsieh, of counsel and on the brief).
Daniel I. Bornstein, Deputy Attorney General, (Stuart Rabner, Attorney General, attorney), amicus curiae, submitted a post-argument letter-brief at the court's *628 request.[1]
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
SABATINO, J.S.C., temporarily assigned.
This drunk driving case presents another instance concerning the admissibility of hearsay documents under the Confrontation Clause of the Federal and state Constitutions, in light of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (reinterpreting the Confrontation Clause to bar the admission against the accused of so-called "testimonial" hearsay declarations), and its progeny. Specifically, we are again asked to consider whether Crawford requires the exclusion of a laboratory report prepared by a State Police chemist and a blood test certificate prepared pursuant to N.J.S.A. 2A:62A-11 by a hospital employee who had extracted blood from the defendant driver at the request of a police officer.
For the reasons we explain in this opinion, we reaffirm our holdings in State v. Berezansky, 386 N.J.Super. 84, 899 A.2d 306 (App.Div.2006) (ruling that a State Police chemist's lab report is "testimonial" under Crawford and thus must be excluded unless defendant has an opportunity to cross-examine the chemist), and in State v. Renshaw, 390 N.J.Super. 456, 915 A.2d 1081 (App.Div.2007) (holding that a blood test certificate issued pursuant to N.J.S.A. 2A:62A-11 is likewise "testimonial" under Crawford), particularly in light of the United States Supreme Court's most recent explication of the Crawford testimonial standard in Davis v. Washington, 547 U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). However, we also highlight the practical implications of these constitutional holdings. In doing so, we suggest that legislative or administrative rule-making efforts might be undertaken to assure that the constitutional principles are administered fairly, without placing undue burdens on third-party witnesses and law enforcement personnel who may create documents relevant to drunk driving prosecutions.
Because defendant was deprived of his constitutional rights of confrontation, we hold that the chemist's report and the hospital worker's blood test certificate were improperly admitted as part of the State's evidence at trial. Nevertheless, we sustain his DWI conviction under N.J.S.A. 39:4-50 on independent grounds, based upon the arresting police officer's numerous field observations of intoxication that were not contradicted by competing proofs at the municipal trial and were ratified by the Law Division.

I.
At about 1:35 a.m. on March 18, 2005, defendant Adam J. Kent lost control of his Lincoln automobile while driving on Rae Avenue in Hawthorne. The Lincoln jumped a curb and flipped over onto its roof, landing in the front yard of a residence on Pasadena Place. Parts of the Lincoln were strewn across the roadway and the surrounding area.
Officer James Knepper of the Hawthorne Police Department was dispatched to the accident scene, and he arrived there by approximately 1:40 a.m. Officer Knepper observed the upside-down Lincoln and the surrounding debris on both the west *629 and east sides of Pasadena Place. He also noted tire marks on a curb and across a driveway leading to a snow pile. According to the officer's testimony, the road surface was dry and there was no precipitation.
The officer also saw a person, later identified as defendant, standing next to the Lincoln. Defendant's hair was mussed and his clothes were dirty. The officer asked him whether he was injured. Defendant replied that he was not. The officer then asked defendant if he was the driver and whether there was anyone else in the vehicle. Defendant acknowledged that he was the driver and sole occupant.
At that point defendant asked Officer Knepper if he could retrieve his cell phone from the Lincoln. According to Knepper's trial testimony, the officer then smelled "an odor of an alcoholic beverage on [defendant's] breath," and noticed that defendant's eyes were watery and bloodshot. The officer also noted that defendant was slurring his words and walking very slowly. These observations, as well as the apparently violent nature of the accident, caused the officer to ask defendant if he had drunk any alcoholic beverages that evening. Defendant told the officer that "he only had five beers."[2]
Defendant's admission that he had consumed five beers and the other observed characteristics of him and the accident scene led the officer to conclude that defendant was intoxicated. The officer issued Miranda[3] warnings, and placed defendant in the back of the patrol car. The officer explained at trial that he did not request defendant to perform field sobriety tests, "[d]ue to the nature of the crash" and his concerns about defendant's "safety and possibl[e] . . . internal injuries." In discussing the accident with Officer Knepper, defendant contended that his car had slid while rounding a curve, causing him to lose control.
Emergency medical personnel were summoned. When they arrived, they placed defendant in a neck brace and put him on a back board. The crew members placed defendant into an ambulance and transported him to the emergency room at the nearby Valley Hospital in Ridgewood. Officer Knepper followed the ambulance to the hospital. Upon arrival, he helped the crew remove defendant from the ambulance.
The officer noticed that, once the ambulance crew began attending to him, defendant's demeanor changed from "cooperative" to "antagonist[ic]". According to the officer, defendant demanded to have the neck brace removed and to be taken off the back board. His antagonism surfaced again at the hospital emergency room, fluctuating with moments of cooperation.
Because of the nature of the crash and his perception of defendant's intoxication, Officer Knepper asked hospital staff to draw blood from defendant. That request was documented in a written form, which the officer signed and handed to Roger Gallant, an emergency room employee.[4] Gallant then extracted two vials of blood from defendant in the presence of Officer Knepper. The officer watched Gallant *630 prepare the extraction site, one of defendant's arms, using what the officer described as "some type of alcohol wipe prior to administering a needle." The blood was placed into the vials, which Gallant labeled. The vials came out of a sealed package. Officer Knepper did not recall whether the vials were shaken. He had no knowledge of whether the vials contained the appropriate preservatives.
Gallant handed the blood vials to Officer Knepper. He took them immediately to the Hawthorne Police Headquarters and placed them in an evidence refrigerator. Thereafter, Hawthorne Police Detective Robert King removed the blood samples from the refrigerator and delivered them to a clerk of the New Jersey State Police's regional forensic laboratory in Little Falls. King testified at trial that he documented the chain of custody for the vials. There was no testimony, nor any intimation by defense counsel on cross-examination, that either Officer Knepper or Detective King had tampered with the blood vials while they were in their possession.
In addition to the testimony of Officer Knepper and of Detective King, the municipal prosecutor offered several documents into evidence at defendant's trial. Two categories of those hearsay documents, admitted over defendant's objection, are central to defendant's appeal.
In particular, the State offered into evidence Exhibit S-2, a "Bodily Substance Sample Certification" dated March 18, 2005. The certification, which is consistent with N.J.S.A. 2A:62A-11,[5] was signed by both Roger Gallant and Officer Knepper. Portions of the certification[6] are pre-typed; and other portions are handwritten notations that filled in blanks on the form. The certification reads, in pertinent part, as follows:
I, Roger Gallant, a PCA II, at The Valley Hospital, certify that on 3/18/05, 2005[sic], I obtained the following bodily substance sample from Adam Kent at the request of Ptl. James W. Knepper, # 6229, a law enforcement officer from Hawthorne Police Dept., who identified the patient.
The form also reflects that the type of substance extracted from defendant was blood (consisting of "2 gray-top tubes containing Sodium Fluoride and Potassium Oxalate"). It also states that the "veni-puncture site" was prepared with "Betadine  supplied by officer in kit."
Exhibit S-2 further recites, in pre-printed language, that the specimen was "given to the [requesting] law enforcement officer" and "was taken pursuant to Section 1 of the New Jersey Public Law 1986[,] Chapter 189[7], and was taken in a medically acceptable manner." In signing the form, Gallant certified that the information it contained was true, and that he was aware that he would be subject to punishment if his statements were willfully false.
Notably, Gallant did not testify at the defendant's trial. There is no indication in the record that he was unavailable to appear for the State, under the standards of *631 unavailability set forth in N.J.R.E. 804(a).[8] Nor was Gallant subpoenaed to testify by the defense.
The State also moved into evidence at trial a Certified Laboratory Report (Exhibit S-5) and related toxicology worksheet and gas chromatography documents (Exhibit S-6). These documents were generated by the State Police laboratory. The report was signed by Joseph Messana, a forensic scientist in the laboratory. According to his report, Messana possesses a master's degree in an unspecified field of graduate study, has worked for a State forensic laboratory for fifteen years, and has qualified as an expert witness in court on twenty-one prior occasions.
The report indicates that Messana is "the person responsible for the analysis and the conclusions set forth in the . . . laboratory report," although the worksheet accompanying the report suggests that the ethanol analysis of defendant's blood may have been performed by a technician with the initials "TD." Additionally, the gas chromatography worksheets reflect that persons with the initials "JSM" (likely Joseph Messana), "TD," "MB," and "JC" had participated in that aspect of the testing.
Messana specifically certified on the report that "the equipment used to perform the type of analyses described [in the report] was functioning properly." He further certified that "[t]he test procedures used are accurate, reliable, objective in nature, and performed on a routine basis within the laboratory."
The results reported on Exhibit S-5 showed that defendant's blood alcohol content was 0.103%, a concentration above the legal limits allowable under N.J.S.A. 39:4-50(a)(1). These findings were essentially consistent[9] with the corresponding worksheets admitted into evidence.
Exhibits S-5 and S-6 were received into evidence in lieu of any testimony from Messana or from the other State Police laboratory personnel with initials TD, MB, and JC. Again, the record does not reflect that these persons were unavailable to testify, or that they were ever subpoenaed by the defendant.[10]
The municipal judge admitted S-2, S-5, S-6 and other documents, over the defense's objection, as business records under N.J.R.E. 803(c)(6). At the close of the State's case, defendant moved to dismiss the prosecution, principally because he had been deprived an opportunity to cross-examine at trial the declarants whose assertions were contained in those hearsay *632 documents. The municipal judge denied that motion.
Defendant did not present any live witnesses on his behalf at trial. However, defendant did proffer a report from an expert witness, Gary Lage, Ph.D., a toxicologist. Dr. Lage's report identified what he perceived to be several problems with the analyses of defendant's blood. Among other things, Dr. Lage criticized the incomplete nature of the State's chain of custody documents and their failure to disclose the precision level of the "diluter/pipetter" used in the testing. Noting that defendant weighed approximately 255 pounds and that his blood was not drawn until nearly three hours after the accident at 4:05 a.m., Dr. Lage suggested that at the time of his accident defendant's bloodstream had not fully absorbed the alcohol he had consumed.
Taking into account those factors, as well as various margins of error associated with the pipetter and ethanol involved in the blood testing, Dr. Lage opined that defendant's blood alcohol concentration (BAC) could have been less than the 0.103% reported by the State Police laboratory and, in fact, could have been under 0.10%. Dr. Lage did not, however, offer an opinion that defendant's BAC could have been below 0.08%.
After being supplied with the defense expert's report, the municipal prosecutor stipulated to its admission. The prosecutor also stipulated that the State could not prove beyond a reasonable doubt that defendant's blood alcohol concentration exceeded 0.10%. That concession signified that defendant could only be convicted of a so-called "Tier One" first-time DWI offense under N.J.S.A. 39:4-50(a)(1)(i) (prohibiting driving with a blood alcohol concentration of 0.08% or higher), rather than face more severe penalties for a 0.10% or higher BAC. See N.J.S.A. 39:4-50(a)(1)(ii). Defendant therefore moved Dr. Lage's expert report, Exhibit D-1, into evidence and did not call Dr. Lage.
In summation, defendant argued that his inability to cross-examine the respective hearsay declarants who had authored the blood sample certification and the State Police laboratory records violated his Sixth Amendment right of confrontation under the standards of Crawford v. Washington, supra. Defendant separately contended that the field observations of Officer Knepper did not suffice to support a DWI conviction. Among other things, defendant stressed that Officer Knepper had not witnessed the accident, and that his observations of defendant's bloodshot eyes, mussed clothing, slurred speech, and slow gait were all explainable as a consequence of either late-night fatigue or the after-effects of an accident.
The prosecutor argued, in response, that the State's forensic proofs had all been properly admitted into evidence. Moreover, the prosecutor contended that the officer's field observations of defendant following this single-car rollover accident on apparently dry pavement, coupled with defendant's own voluntary admission that he drank at least five beers that evening, amply proved defendant's guilt beyond a reasonable doubt.
After considering all of these matters, the municipal judge convicted defendant of a first-time DWI offense under N.J.S.A. 39:4-50(a)(1)(i), merging into that conviction a separate traffic summons which defendant had been issued charging him with careless driving under N.J.S.A. 39:4-97. The judge sentenced defendant to serve twelve hours in the Intoxicated Driver Resource Center (IDRC). He also imposed a three-month suspension of defendant's driving privileges, plus various monetary fines, penalties and costs. Defendant's sentence was stayed pending appeal.
*633 On de novo review, the Law Division upheld defendant's DWI conviction. The Law Division judge held that the admission of the blood sample certificate and the State Police laboratory documents did not violate the Confrontation Clause under Crawford, because those documents, in the judge's view, were not "testimonial" in nature. Accordingly, the Law Division held that defendant's reported blood alcohol concentration of 0.103%, (stipulated by the State to be treated as being no greater than 0.10%), provided a per se forensic basis to convict defendant beyond a reasonable doubt of driving while under the influence of alcohol. N.J.S.A. 39:4-50.
Apart from the forensic proofs, the Law Division judge was also persuaded that defendant's DWI conviction was independently sustainable beyond a reasonable doubt, based upon Officer Knepper's numerous field observations indicative of defendant's intoxication. The Law Division judge catalogued those facts in detail:
[T]he State had to prove that the [d]efendant was under the influence of alcohol at the time he was driving. Combinations of factors such as slurred speech, loud abrasive behavior, disheveled appearance, red and bloodshot eyes, the odor of alcohol on a defendant's breath, failure to produce driving credentials, and erratic driving have all been held sufficient to sustain a conviction for driving while intoxicated. See State v. Cryan, 363 N.J.Super. 442, 455 [833 A.2d 640] (App.Div.2003); See also State v. Hudes, 128 N.J.Super. 589, 607 [321 A.2d 275] (Law Div.1974). Here, the record demonstrates that almost all of these factors were present.
Based on [Officer] Knepper's testimony, the state established that (1) the [d]efendant admitted that he lost control of is car causing it to go off the road and flip over onto its roof, (2) his hair was mussed and his clothes were dirty, (3) his eyes were watery and bloodshot, (4) he had the odor of alcohol on his breath, (5) he slurred his words when he spoke, (6) he was walking in a slow manner, (7) he admitted that he had consumed five beers that evening, and (8) he acted in an antagonistic manner towards the officer when he arrived at the hospital.
Despite the fact that the defendant suggests innocent connotations for each of these factors individually, "[i]t is not fatal to the State's case that these, or other speculative circumstances, permit of some other rational[ ] explanation of defendant's conduct or fail to exclude every other conceivable hypothesis except guilt." State v. Brown, 80 N.J. 587, 599 [404 A.2d 1111] (1979). What is required is that all of the evidence combined leaves the factfinder "firmly convinced" of the [d]efendant's guilt. State v. Medina, 147 N.J. 43, 60-61 [685 A.2d 1242] (1996). This Court finds that the combination of the [d]efendant's admissions, the physical indicia of intoxication he displayed, as well as his hostile behavior towards the police officer in the hospital establishes beyond a reasonable doubt that he was under the influence of alcohol when he drove his car off of the road. Accordingly, this Court finds the [d]efendant guilty, de novo, of driving while intoxicated in violation of the subjective prong of N.J.S.A. 39:4-50.
Consequently, defendant's conviction was affirmed in the Law Division. This appeal followed.[11]

II.
Defendant's main argument on appeal is that the trial judge unconstitutionally admitted into evidence the State Police laboratory *634 report and related worksheets, as well as the hospital employee's blood sample certificate, thereby depriving him of his rights of confrontation under the Federal and state Constitutions. Defendant hinges that argument upon the United States Supreme Court's seminal opinion in Crawford v. Washington, supra, declaring that so-called "testimonial" hearsay statements may not be admitted against an accused, unless the declarant of each such statement is unavailable for trial, and the accused had a prior opportunity for cross-examination of the declarant concerning the statement. Id., 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
As we have previously recognized, see State v. Buda, 389 N.J.Super. 241, 248-54, 912 A.2d 735 (App.Div.2006), the Supreme Court's re-interpretation of the Confrontation Clause in Crawford overruled long-standing prior case law and has greatly affected the admissibility of hearsay declarations in criminal prosecutions. From 1980 through the issuance of Crawford in 2004, our nation's highest Court construed the Confrontation Clause to permit out-of-court statements to be admitted for their truth against an accused, provided that those statements were based upon "firmly rooted" hearsay exceptions, or which otherwise had "particularized guarantees of trustworthiness." See Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). In an effort to restore the Clause's presumed original meaning intended by the Framers of the Bill of Rights, Crawford rejected the two-part Roberts test. In its place, Crawford declared that out-of-court declarations, no matter how reliable they may be and regardless of whether they satisfy an established exception under the hearsay rules, would not be admissible for their truth in criminal prosecutions if they are "testimonial" in nature. Crawford, supra, 541 U.S. at 53-54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194.
In another seminal opinion, decided in June 2006 after the matter now before us was tried, the United States Supreme Court clarified in Davis v. Washington, supra, that hearsay statements are "non-testimonial" when they are "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id., 547 U.S. at ___, 126 S.Ct. at 2273-74, 165 L.Ed.2d at 237. Conversely, Davis instructed that statements are "testimonial" if "the circumstances objectively indicate that there is no such ongoing emergency, and . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id.
Just a few weeks ago, the Supreme Court unanimously reaffirmed the continued vitality of the Crawford "testimonial" standard of admissibility in Whorton v. Bockting, 549 U.S. ___, 127 S.Ct. 1173, ___ L.Ed.2d ___ (2007). In Whorton, the Court held that Crawford had announced a "new rule" of constitutional law which is "flatly inconsistent with the prior governing precedent." Id., 549 U.S. ___, 127 S.Ct. at 1181, ___ L.Ed.2d at ___. However, the Court declined to apply Crawford's testimonial standard collaterally to cases that were not pending or on direct appeal when Crawford was decided in June 2004. The Court observed in this regard that the Crawford test had been adopted to restore "the [Framers'] original understanding of the meaning of the Confrontation Clause," rather than to enhance the "fundamental fairness and accuracy" of criminal proceedings. Id., 549 U.S. at ___-___, 127 S.Ct. at 1181-82, ___ L.Ed.2d at ___-___.

*635 A.
Before applying the precepts of Crawford and Davis to this appeal, we should first address, at least briefly, whether constitutional rights of confrontation in the Sixth Amendment extend to drunk driver prosecutions in the municipal court. We have already twice answered that question in the affirmative. See State v. Berezansky, supra, 386 N.J.Super. at 90 n. 4, 899 A.2d 306 and State v. Renshaw, supra, 390 N.J.Super. at 463 n. 4, 915 A.2d 1081. Our reasoning in both Berezansky and Renshaw stemmed from a recognition that a DWI charge is a "quasi-criminal" offense, and one that carries consequences of magnitude. See State v. Widmaier, 157 N.J. 475, 492-96, 724 A.2d 241 (1999). We discern no sound basis to depart from that assumption here. Indeed, courts across the nation have repeatedly applied Crawford's standards of confrontation in settings involving drunk driving charges and other municipal prosecutions.[12] In continuing to apply the Confrontation Clause to drunk driver prosecutions in the municipal court, we are mindful that our State Supreme Court has extended many, but not all, of the Sixth Amendment's various guarantees to such DWI trials.[13]
We also note that the Sixth Amendment's confrontation guarantee has been deemed applicable to state courts for several decades through the Due Process Clause of the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 927-28 (1965). For these reasons, we sustain the Law Division's initial premise that the Confrontation Clause of the Federal Constitution, and Crawford's testimonial/non-testimonial standards of admissibility, apply to this case, and to others similarly situated.
We now turn to the substantive application of Crawford, as clarified in Davis, to the two forms of hearsay documents which *636 are at issue on this appeal: (1) the State Police laboratory reports analyzing defendant's blood alcohol concentrations and (2) the private hospital employee's blood sample certificate. We address these items separately.

B.
The State Police laboratory report authored by the forensic scientist, Joseph Messana, was classified by the municipal judge and by the Law Division judge as a "business record" under the hearsay exception of N.J.R.E. 803(c)(6).[14] Defendant does not contest the applicability of this exception, although we perceive that the document might also fit, and perhaps more logically so, under the hearsay exception for public records under N.J.R.E. 803(c)(8). See State v. Matulewicz, 101 N.J. 27, 31-32, 499 A.2d 1363 (1985) (recognizing that a State Police chemist's laboratory report identifying a controlled dangerous substance may be admitted, in proper circumstances, as either a business record or a public record under former Evid. R. 63(13) and 63(15)(a)).
Defendant does not challenge the authenticity of the State Police laboratory reports, or the regularity of their maintenance. However, defendant does raise concerns about several perceived discrepancies in the documents, including such aspects as their failure to specify which technicians performed which elements of the testing, the true identities of the technicians identified only by initials, and alleged disparities between the laboratory certificate and the associated worksheets. Defendant argues that these documents are testimonial in nature, and that he was entitled to probe into the potential discrepancies within them through cross-examination of the person or persons who prepared them.
In State v. Berezansky, supra, 386 N.J.Super. at 89-96, 899 A.2d 306, we held that a defendant in a drunk-driving prosecution was similarly denied his constitutional guarantee of confrontation when a municipal judge admitted a State Police laboratory certificate reflecting that his blood alcohol level exceeded the statutory limits. Applying the tenets of Crawford, we determined in Berezansky that the laboratory documents were inadmissible, absent confrontation, because they were "prepared specifically in order to prove an element of the [DWI charge] and offered in lieu of producing the qualified individual who actually performed the test." Id. at 94, 899 A.2d 306. Because the defendant in Berezansky had objected to the admission of the lab reports, invoking his confrontation rights, we reversed his conviction and remanded for a new trial. Id. at 100, 899 A.2d 306. We noted that the prosecution on remand could not rely upon the lab reports unless it produced a trial witness "to testify on personal knowledge of the testing and the preparation of the lab certificate." Ibid.
Twelve days after our opinion in Berezansky, the United States Supreme Court decided Davis v. Washington, supra, a case which fortifies the soundness of our application of the prevailing Confrontation Clause jurisprudence. As we noted, Davis treats as "testimonial" hearsay statements *637 made in the course of police interrogation "when the circumstances objectively indicate that there is no . . . ongoing emergency, and . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis, supra, 547 U.S. at ___, 126 S.Ct. at 2273-74, 165 L.Ed.2d at 237.
Here, it is clear that there was no "ongoing emergency" when the State Police laboratory chemists analyzed defendant's blood. Nor can it reasonably be argued that the "primary purpose" of the lab certificate was anything other than to prove past events, specifically defendant's blood alcohol concentration, relevant to his DWI prosecution. Indeed, the county prosecutor's brief on appeal initially[15] conceded that Berezansky applies and mandates the exclusion of the laboratory reports in the absence of a testifying witness who would be cross-examined about the document.
Likewise, we recently decided in State v. Renshaw, supra, that a hospital nurse's blood sample certification under N.J.S.A. 2A:62A-11 is testimonial under Crawford. In Renshaw, as here, a private hospital employee was asked by a police officer to draw blood from a suspected drunk driver. 390 N.J.Super. at 460, 915 A.2d 1081. The employee did so, using a kit supplied by the police officer. Ibid. The employee then provided two vials of extracted blood to the officer, along with a signed certification pursuant to N.J.S.A. 2A:62A-11. Following the reasoning of Berezansky and other post-Crawford case law, we determined that the blood certification was testimonial because it had been prepared "solely to be used" as evidence in a prospective court proceeding against the driver. State v. Renshaw, supra, 390 N.J.Super. at 467, 915 A.2d 1081. We therefore reversed the defendant's DWI conviction because he had been deprived of an opportunity to cross-examine the nurse who had signed the certification. Id. at 468-69, 915 A.2d 1081.
We now reaffirm our analysis in Renshaw. The blood sample certification executed by Roger Gallant in the case at bar was not prepared to assist police with an "ongoing emergency." Davis, 547 U.S. at ___, 126 S.Ct. at 2274, 165 L.Ed.2d at 237. Although one might theoretically conceive of the need to analyze defendant's blood as emergent in nature because of the bodily absorption and dissipation of alcohol, the circumstances at the hospital do not bespeak the kind of emergency depicted in Davis. In Davis, the declarant, a 9-1-1 caller, was seeking an immediate police response to a domestic violence incident. Id., 547 U.S. at ___, 126 S.Ct. at 2270-71, 165 L.Ed.2d at 234-35. In this regard, we liken the circumstances here to the companion case decided with Davis, Hammon v. Indiana, in which the Court held there was no "ongoing emergency" by the time police had arrived at the residence of a couple involved in a domestic incident and their hostilities had subsided. Id., 547 U.S. at ___-___, 126 S.Ct. at 2272-73, 165 L.Ed.2d at 235-36.
Additionally, the "primary purpose" of the blood certificate was surely to preserve evidence for a future anticipated DWI prosecution. Davis, supra, 547 U.S. at ___, 126 S.Ct. at 2273, 165 L.Ed.2d at 237. The samples were not extracted for purposes of medical treatment. The legislative purpose behind the blood sampling statute, which includes the certificate process, could not be plainer in this respect:

*638 When individuals taken into custody for driving while intoxicated or death by auto refuse or are unable to provide breath samples for testing to determine blood alcohol content, police officers frequently seek the assistance of medical personnel. These personnel are often reluctant to take specimens out of a concern that the subject may institute civil or criminal charges for assault and that they will be required to appear in court to testify about the manner and circumstances under which the sample was taken. The purpose of Senate Bill No. 1089 is to encourage medical personnel to cooperate with law enforcement officials in obtaining these samples.

[Senate Law, Public Safety and Defense Committee, Statement to Senate Bill No. 1089, L. 1986, c. 189 (emphasis added).]
We recognize that hospital nurses, phlebotomists and other medical personnel are not police officers. Nonetheless, their close interaction with law enforcement officers, in extracting blood from DWI suspects and in certifying as to "the manner and circumstances under which the sample was taken," ibid., readily places them within the ambit of the "testimonial" boundaries of Crawford.
We reached a similar conclusion in Buda, supra, in holding that a DYFS worker's private interview with a battered young child in a hospital room, after the worker first spoke with an investigator from the prosecutor's office and with a physician who had suspected wrongdoing by the defendant, should be treated under Crawford and Davis as a "testimonial" context. Buda, supra, 389 N.J.Super. at 252, 912 A.2d 735. Because the child did not testify at trial and defendant had no chance for cross-examination, his hearsay statement to the DYFS worker was held constitutionally inadmissible. Ibid.
Defendant's legitimate need for confrontation of the hospital worker is especially salient in this case, given the asserted discrepancies between the blood sample certificate and the testimony of Officer Knepper. The officer's sworn recollection that Gallant applied "some type of alcohol wipe" to defendant's arm before inserting the needle raises a bona fide concern that defendant's blood sample may have been tainted with alcohol from an external source. The blood certificate says otherwise, indicating that the extract on site was instead prepared with Betadine, "supplied by [the] officer in [his] kit."[16] It may well be that Officer Knepper was mistaken in his recollection, but that is the sort of issue that warrants explanation through the live testimony of the hospital employee. Similarly, the officer was unsure if Gallant shook the preservative in the vial, a potential omission which may have affected the sample as well. Again, Gallant himself could vouch for that on the witness stand. In sum, the reasons why defendant wishes to cross-examine Gallant in this case are not fanciful or vexatious.
The State argues[17] that Crawford has no bearing on the admissibility of hospital worker's certificate because Gallant was not subjected to "police interrogation." See Davis, supra, 547 U.S. at ___, 126 S.Ct. at 2273, 165 L.Ed.2d at 237. That argument is unpersuasive.
For one thing, the Supreme Court specifically recognized in Davis that it should *639 not be implied that "statements made in the absence of any interrogation are necessarily non-testimonial[.]" Id., 547 U.S. at ___ n. 1, 126 S.Ct. at 2274, 165 L.Ed.2d at 237. In that vein, the Court previously indicated in Crawford that "affidavits" of witnesses are within the "core class" of hearsay declarations likely to be regarded as testimonial. Crawford, 541 U.S. at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. The blood certification here, attested to by Gallant with language certifying that its contents are true and with his recognition that any "willfully false" statements may subject him to punishment, is the functional equivalent of an affidavit in New Jersey practice. See R. 1:4-4(b) (allowing certifications to be utilized in sworn affidavits). Moreover, the blood was drawn and the corresponding certification was prepared at the behest of a police officer, consistent with N.J.S.A. 2A:62A-11. The certification is Gallant's response to a police inquiry, no less than a stationhouse interviewee's account given to an interrogating police officer.
The State points to several post-Crawford cases from other jurisdictions treating certain hearsay documents such as laboratory reports, breathalyzer certificates and autopsy reports as non-testimonial. For example, the State relies upon State v. Huu The Cao, 175 N.C.App. 434, 626 S.E.2d 301, review denied, 360 N.C. 538, 634 S.E.2d 537 (2006), a pre-Davis decision in which the North Carolina court formulated a distinction between laboratory reports that are non-testimonial and those which are testimonial. Specifically, Huu The Cao treated as non-testimonial lab reports that are generated from testing that is "mechanical," and which contain only "objective facts not involving opinions or conclusions drawn by the analyst." Id. at 305. The court contrasted lab reports involving blood alcohol concentrations, for which cross-examination "may not be necessary," with "fiber or DNA analysis or ballistics comparisons," which the court perceived to involve more sophisticated technical aspects. Ibid.
Some other cases have similarly attempted to draw a line between sophisticated or opinion-laden hearsay reports, treating them as "testimonial." Reciprocally, those cases have deemed "non-testimonial" reports perceived to contain routine technical information, or have otherwise declared certain "business records" utilized in prosecutions as "non-testimonial."[18]
However, other courts following Crawford have reached different conclusions. For example, in State v. Caulfield, 722 N.W.2d 304 (Minn.2006), the Minnesota Supreme Court classified as testimonial a report from a state laboratory identifying a seized substance as cocaine. The court observed that the lab report had three characteristics fitting the generic descriptions of testimonial statements suggested by the Supreme Court in Crawford: *640 (1) the "lab analyst submitting the report attested to her findings;" (2) the report "functioned as the equivalent of testimony" on the identification of the substance; and (3) the report was "prepared at the request of the . . . police for the prosecution of [defendant], and was offered at trial specifically to prove an element of the crimes with which he was charged." Id., 722 N.W.2d at 309. Similar findings of inadmissibility, at times with comparable reasoning, have been reached in other jurisdictions after Crawford.[19]
We recognize, as we have before, see State v. Buda, supra, 389 N.J.Super. at 257, 912 A.2d 735 (majority opinion of Stern, J.) and at 258-59 (Sabatino, J. concurring), that the state of the law following the United States Supreme Court's pronouncements in Crawford, Davis and now Whorton, is most assuredly evolving.[20] We also are very mindful that our own Supreme Court has yet to address these constitutional issues substantively. Nonetheless, we must decide the case before us without the luxury of awaiting more comprehensive or definitive national guidance on the contours of "testimonial" declarations.
Although we surely appreciate the practical quandaries created by post-Crawford jurisprudence, we are unpersuaded that the State Police laboratory reports and the blood sample certificate admitted over defendant's objection in this case were non-testimonial simply because they were technical in nature or because they were prepared in the ordinary course of a DWI investigation. While the information on those records is technical in many, but not all, respects, we cannot say that their certified contents are beyond the scope of testimonial assertions that a defendant is entitled to test through cross-examination in a courtroom.
We therefore reaffirm our prior holdings in Berezansky and in Renshaw, and hold that, under the prevailing law of the Sixth Amendment, defendant was constitutionally entitled to cross-examine the declarants who authored those documents.

C.
Defendant also contends that he is independently entitled to cross-examine the authors of the laboratory reports and the blood sample certificate under the Confrontation Clause of the New Jersey Constitution, article I, paragraph 10, regardless of whether such a confrontation right is mandated under the Federal Constitution. We disagree.
The texts of the Confrontation Clause in the Sixth Amendment of the United States Constitution and in article I, paragraph 10 of our state constitution are identical. We recognize that at times our Supreme Court has construed provisions in our state constitution as conferring upon New Jersey citizens greater protections than those they enjoy as United States citizens under cognate provisions in the Federal Constitution. See, e.g., State v. Hempele, 120 *641 N.J. 182, 576 A.2d 793 (1990) (state constitutional right of privacy in curbside trash disposed of in sealed containers); State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982) (state constitutional right of privacy in telephone billing records); State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980) (state constitutional right of free speech on certain privately-owned property that has been opened for public use). However, the recognition of such additional protection under our State's charter has been occasional and by no means automatic. See State v. Hunt, supra, 91 N.J. at 358-73, 450 A.2d 952 (Handler, J., concurring) (reciting various factors in deciding whether to adopt a more expansive reading of a state constitutional provision that parallels a federal constitutional provision).
Our case law reflects some ambivalence about whether the Confrontation Clause of the New Jersey Constitution, which has roots in our original state constitution of 1776,[21] should be read more broadly than its federal counterpart. Compare State v. Daniels, 364 N.J.Super. 357, 371-72, 835 A.2d 1261 (App.Div.2003) rev'd on other grounds, 182 N.J. 80, 861 A.2d 808 (2004), ("There is nothing we are referred to, or can find, in its wording, intent or history to suggest that this paragraph of the New Jersey Constitution grants a defendant greater protection than the Sixth Amendment."), with State v. Laboy, 270 N.J.Super. 296, 304, 637 A.2d 184 ("it can fairly be said that the [New Jersey Supreme] Court has been more protective of the defendant's right to cross-examine than the Federal counterpart.") In any event, we are unpersuaded in the present circumstances that article I, paragraph 10 of the state constitution requires any greater protection for accused persons to cross-examine hearsay declarants about their out-of-court testimonial assertions than the United States Supreme Court has pronounced in Crawford and Davis.
For decades our state courts, as other courts in the nation, have routinely admitted certain hearsay statements as part of criminal and quasi-criminal prosecutions, provided that those statements satisfied the Sixth Amendment's two-pronged standards of reliability set forth in Ohio v. Roberts, supra. Now Roberts has been overruled, and categories of hearsay formerly treated as admissible are currently, post-Crawford, subject to exclusion if they are deemed testimonial. See Whorton v. Bockting, supra, 549 U.S. at ___, 127 S.Ct. at 1184, ___ L.Ed.2d at ___ (recognizing that Crawford's testimonial standard mandates the exclusion of certain reliable hearsay formerly admissible under Roberts, but also observing that it is "unclear whether Crawford, on the whole, decreased or increased the number of unreliable out-of-court statements that may be admitted in criminal trials").
Unless our Supreme Court determines otherwise, we discern nothing in the origins, traditions, structure or policies of our state constitution's confrontation clause that would warrant taking a more expansive approach to the right of cross-examination than that which is presently reflected in the federal Sixth Amendment case law under Crawford. Nor does the *642 confrontation right appear to be a subject of unique local concern. See State v. Hunt, supra, 91 N.J. at 364-66, 450 A.2d 952 (Handler, J., concurring) (considering, among other things, the legislative history of a state constitutional provision, subject matters of "particular state interest or local concern," "differences in structure between the federal and state constitutions," and a "state's history and traditions" as germane to deciding whether state constitutional guarantees should exceed those assured under parallel federal constitutional provisions). If, for the sake of argument, post-Crawford federal Sixth Amendment jurisprudence develops in a fashion that renders the hearsay statements at issue here "non-testimonial," we perceive no independent state constitutional basis for constraining their admission into evidence.

D.
Having applied, as we must, the doctrinal holdings of Crawford and Davis to the hearsay statements before us, we now address the practical ramifications of these constitutional analyses. We do so with a full awareness that our case law precedents are not mere theoretical abstractions, but rather serve as guideposts that have real-world impacts in courtrooms for lawyers, clients, and witnesses in everyday settings.
The upshot of classifying declarant's out-of-court statement as testimonial under Crawford is that the declarant must appear in court for cross-examination by defense counsel in order for the State to make use of his or her statement for its truth. That is no minor consequence. Laboratory technicians such as Joseph Messana and hospital workers such as Roger Gallant would need to divert from their regular functions, in testing substances and treating sick people, and travel to courthouses to vouch for the contents of their certified reports. These burdens are especially palpable for hospital workers such as Gallant, a person who does not earn his livelihood as a civil servant but rather as a medical provider who serendipitously had a brief professional encounter in the emergency room with a police officer and an apparently-inebriated motorist.
We take judicial notice that the municipal courts where DWI trials are conducted in this State frequently operate in the evenings. The courts are scattered among over 500 municipalities, sometimes being located at considerable distances from the nearest hospital where drunk drivers may be brought to have their blood drawn. These practical realities trigger significant concerns about the burdens we anticipate will be imposed upon nurses, phlebotomists and other hospital workers by virtue of holding that their presence at DWI trials is constitutionally essential. We also take judicial notice of the general shortage of nurses, which appears to be more severe in our state than it is nationally.[22]
*643 The Legislature was acutely conscious of these burdens when it adopted N.J.S.A. 2A:62A-10 and -11. Through this statute the Legislature sought to encourage medical professionals who draw blood from DWI suspects to cooperate with police officers, who often need their immediate assistance, by easing their responsibilities as eventual witnesses. See Senate Committee Statement, supra. See also State v. DeFrank, 362 N.J.Super. 1, 5-7, 826 A.2d 773 (App.Div.2003) (observing that N.J.S.A. 2A:62A-11 was adopted "in response to the difficulties experienced by municipal prosecutors in securing the appearance of medical personnel at DWI trials and the concomitant strain those court appearances placed upon the affected medical professionals"). Consistent with those legislative aims, we believe it is appropriate to take into account the potential hardship upon third-party witnesses that may result from enforcing defendants' rights of confrontation in the post-Crawford era.
The judiciary has a recognized duty to be protective of third-party witnesses who may be called upon to recount their personal knowledge in court proceedings. For example, N.J.R.E. 611, like its federal analogue F.R.E. 611, vests judges with authority to protect witnesses from "harassment," and also to "avoid needless consumption of time." N.J.R.E. 611. See, e.g., United States v. Sorrentino, 726 F.2d 876, 884-85 (1st Cir.1984) (upholding a trial judge's limitations upon defense counsel's cross-examination of a witness because it was needlessly cumulative and harassing). We also proscribe attorney conduct that is frivolous or designed to harass others. See R. 1:4-8. We further assure that fact witnesses called to court are reimbursed, albeit in modest amounts, for their travel expenses. See N.J.S.A. 22A:1-4.
We therefore do not wish the administration of the confrontation rights of defendants charged with DWI violations to impose undue logistical or personal burdens upon the law enforcement personnel and third-party witnesses who are summoned to testify concerning the contents of their hearsay declarations. To the extent feasible, the time chemists spend away from their laboratories and nurses spend away from their patients should be minimized. Toward that end, we discourage the pro forma insistence that such persons appear at DWI trials to vouch for the contents of their reports, if there are no bona fide subject matters in dispute on which defense counsel intends to cross-examine them.
In making these general observations, we by no means intimate in this case that defense counsel's insistence upon the presence of lab chemist Messana and of hospital worker Gallant at his client's DWI trial was frivolous or designed to harass those witnesses. As we have already noted, defense counsel has identified several potential discrepancies in the lab reports and on the blood certificate that justify the sought-after cross-examination of these witnesses. Rather, we express our disfavor of routine demands for the live testimony of lab technicians and hospital workers if there truly is nothing worthwhile to be asked of them on cross-examination. Although we strive to enforce constitutional rights, we also discourage adversarial gamesmanship.
That being stated, we deem it appropriate prospectively to require, as a condition of our treatment of lab reports and blood sample certificates as "testimonial" documents, that defense counsel provide reasonable advance notice to prosecutors that they wish to cross-examine the *644 authors of those documents at trial. In the absence of such reasonable notice, a defendant shall be deemed to have waived his or her right to confrontation.
By analogy, such a notice-demand requirement is contained within N.J.S.A. 2C:35-19(c). That statute allows lab certificates attesting to the composition of a controlled dangerous substance to be presented in court in lieu of the laboratory technician's live testimony, unless the defendant provides the State with advance notice of objection to the admission of the certificate and demands the technician's appearance at trial. N.J.S.A. 2C:35-19(c). In State v. Miller, 170 N.J. 417, 436, 790 A.2d 144 (2002), our Supreme Court declared that statute's notice-demand procedure constitutional under the Confrontation Clause, finding no infringement upon a defendant's rights by requiring him or her to "object to the lab certificate and assert that the composition, quality, or quantity of the tested substance will be contested at trial." Ibid. In this fashion, the statute serves a legitimate purpose, i.e., "to weed out prior to trial those cases in which there is a contest over the scientific proof and with respect to which the State will be required to produce a witness or prove why one is not necessary." Ibid.
The Supreme Court in Miller did interpret N.J.S.A. 2C:35-19(c) in a manner which excised the statute's additional proviso that the party objecting to the admission of the lab certificate identify his or her "specific grounds for that objection." Id. at 432-36, 790 A.2d 144. The Court held that "a defendant cannot, as a matter of constitutional imperative, be assigned any burden to detail an objection to the admission of [a][CDS] lab certificate." Id. at 436, 790 A.2d 144. The Court noted that it is the State's burden to prove guilt beyond a reasonable doubt, and a defendant should not be required "to vault a legal hurdle" in order to exercise his right to confrontation of the State's witnesses. Id. at 434, 790 A.2d 144. To save the statute from constitutional infirmity, the Court therefore eliminated its requirement for defendants to articulate their "specific grounds" of objection. See also id. at 433, 790 A.2d 144 ("[b]ecause it is always the [S]tate and not defendant that bears the burden of justification [of the admission of the contents of certified reports], imposition of a barrier, beyond notice, to defendant's exercise of his right to confrontation cannot be countenanced.").
Thus, we similarly adhere to the precepts of Miller by holding that, at a minimum, a DWI defendant must give the prosecution appropriate notice of his or her invocation of the constitutional right of confrontation, and must timely demand the appearance of persons who prepare laboratory reports and blood certificates sought to be admitted by the State. Absent such notice and demand, the constitutional right should be deemed waived. In this regard, we note that several jurisdictions, in cases decided after Crawford or Davis, continue to recognize the validity of notice-demand statutes for various business records commonly used in prosecutions. See, e.g., State v. Cunningham, 903 So.2d 1110, 1115 (La.2005); State v. Campbell, 719 N.W.2d 374, 378 (N.D.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1150, 166 L.Ed.2d 993 (2007); Brooks v. Commonwealth, 49 Va. App. 155, 638 S.E.2d 131, 134-36 (2006).
To implement our holding, we recommend that the Legislature, or appropriate rule-making bodies of the judiciary such as the Supreme Court's Committees on Criminal Practice and Municipal Practice, examine these issues. We suggest they consider the adoption of statutes or court *645 rules[23] patterned after N.J.S.A. 2C:35-19 that would create similar notice-demand requirements for State Police lab reports used in DWI trials and also for blood sample certificates generated under N.J.S.A. 2A:62A-11. We do not suggest any particular time lines or procedures for such notice-demand provisions, but instead defer to the prospective development of appropriate measures through such rule-making or legislation.
Apart from notice-demand requirements, we also believe it worthwhile for the Legislature or the relevant Supreme Court Committees to explore means of abating the time and travel burdens upon nurses, chemists and other third-party witnesses who now will be constitutionally required to travel to municipal court for DWI trials. For instance, such bodies might explore the feasibility of remote video conferences at trials or de bene esse videotaped depositions, so that such witnesses need not physically appear in municipal courts late at night. Another possibility that can be considered is whether the scheduling or venues of DWI trials might be altered to minimize logistical burdens on medical providers and laboratory personnel, including the creation of special daytime court calendars to accommodate such witnesses. Again, we leave such innovations to the creative processes of legislation and rule-making.[24]
In sum, we express our hopeful expectation that the new rules of confrontation announced in Crawford can be implemented in our State in a fashion that does not thwart the efficient and fair administration of justice in the municipal courts, nor impose excessive burdens on law enforcement personnel and medical providers.

III.
Having accepted defendant's contention that he was constitutionally entitled to confront the respective authors of the State Police lab reports and the blood sample certificate admitted at his DWI trial, we finally consider whether his conviction remains valid by virtue of the arresting officer's independent observations of his apparent intoxication. For the reasons delineated at length by the Law Division judge, we agree that defendant's conviction under N.J.S.A. 39:4-50 should be affirmed based upon those unrebutted observations.
A defendant's "slurred speech, loud and abrasive behavior, disheveled appearance, red and bloodshot eyes and strong odor of alcoholic beverage on [his] breath [are] sufficient to sustain a conviction for DWI." See State v. Cryan, 363 N.J.Super. 442, 455-56, 833 A.2d 640 (App.Div.2003) (citing State v. Morris, 262 N.J.Super. 413, 421, 621 A.2d 74 (App.Div.1993)). We have carefully reviewed the record, and conclude that there is "sufficient credible evidence" to support defendant's conviction of a DWI violation under N.J.S.A. 39:4-50 beyond a reasonable doubt. See State v. Locurto, 157 N.J. 463, 470, 724 A.2d 234 (1999) (noting the limited standard of appellate review of factual findings).
*646 We recognize that each of the factors indicating defendant's intoxication, identified by Officer Knepper and relied upon in the Law Division, may singularly be insufficient. However, we are satisfied that those numerous factors, when considered in combination, are more than ample to support the conclusion that defendant was driving under the influence of alcohol when he flipped over his automobile while driving on a roadway that the police officer emphatically described as dry and without precipitation.
Lastly, we reject defendant's argument that he was prejudiced by the prosecutor's failure to supply him with discovery. The discovery sought was almost entirely aimed at the laboratory analyses of defendant's blood, which we have excluded from our substantive consideration as the result of our Sixth Amendment holdings. A dismissal of defendant's DWI charges is not warranted in these circumstances. See State v. Clark, 347 N.J.Super. 497, 508-09, 790 A.2d 945 (App.Div.2002) (noting that the remedy of dismissal for discovery violations requires either "intention inconsistent with fair play" or "egregious carelessness or prosecutorial excess tantamount to suppression"). We also recognize the deference to be accorded to trial judges on such discovery matters See, e.g., State v. Scherzer, 301 N.J.Super. 363, 417-18, 694 A.2d 196 (App.Div.1997), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997).
We therefore affirm defendant's conviction. The stay of his sentence is hereby lifted, effective within fourteen days of the issuance of this opinion.
STERN, P.J.A.D. (concurring).
I concur in the holding that Officer Knepper's testimony of his observations of defendant was sufficient to sustain the conviction and believe that the conviction can be affirmed on that basis. The introduction of other evidence now found to be inadmissible can hardly be said to affect the finding of the Law Division that the conviction was sustainable on Knepper's testimony regarding his observations.[1]
Having said that, I am tempted to be jurisprudentially cautious and say no more. But as Judge Sabatino said in State v. Buda, 389 N.J.Super. 241, 258, 912 A.2d 735 (App.Div.2006) (Sabatino. J. concurring), the "sea change in criminal practice [brought about by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] cannot be underestimated." Therefore, although this court lacks the Supreme Court's supervisory authority over trial courts, see State v. Daniels, 182 N.J. 80, 96, 861 A.2d 808 (2004), I believe it is incumbent upon us to endeavor to guide trial judges and litigants through the mine field of post-Crawford precedent in the context of New Jersey law until the Supreme Court has the occasion to address the subject. My sense of obligation in this respect is pragmatic, not academic. Absent a guiding voice at this juncture, cases may have to be reversed and retried, thereby prolonging the agony of litigants seeking finality to their litigation and delaying others who want the same. I therefore believe that, as *647 intermediate appellate judges, we are obligated to address more than what is necessary to decide this case.
Accordingly, I address all issues raised by defendant, and concur, for the reasons expressed in Judge Sabatino's thorough and comprehensive opinion, that the "Bodily Substance Sample Certification" executed by Nurse Gallant and Officer Knepper and the State Police laboratory report are inadmissible as violative of Crawford v. Washington, supra, and Davis v. Washington, 547 U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). I do so because I am inclined to believe that our Supreme Court would apply those cases to a non-criminal prosecution for driving while intoxicated under N.J.S.A. 39:4-50 ("DWI"). However, I am not prepared to say, and do not hold, that the Federal Constitution actually requires that holding in a case involving non-indictable or "petty" offenses. Nor do I believe that our Supreme Court has held that article I, paragraph 10 of our state constitution applies to all prosecutions for non-indictable offenses.
Article I, paragraph 10 of the New Jersey Constitution has been held to provide protections to our citizens co-extensive with the Sixth Amendment of the Federal Constitution. See State v. Garron, 177 N.J. 147, 168-69, 827 A.2d 243 (2003); State v. Daniels, 364 N.J.Super. 357, 370-72, 835 A.2d 1261 (App.Div.2003), rev'd on other grounds, 182 N.J. 80, 861 A.2d 808 (2004); State v. Benitez, 360 N.J.Super. 101, 113-16, 821 A.2d 547 (App.Div.2003); State v. Washington, 202 N.J.Super. 187, 191, 494 A.2d 335 (App.Div.), certif. denied, 102 N.J. 308, 508 A.2d 192 (1985). Our Supreme Court has also stated that "defendants charged with quasi-criminal offenses `are entitled to the same protection[s] as are normally accorded one accused of a criminal offense.'" State v. Widmaier, 157 N.J. 475, 495, 724 A.2d 241 (1999) (describing the holding of State v. Francis, 67 N.J.Super. 377, 381, 170 A.2d 476 (App.Div.1961) in a parenthetical). As a result, we have said that "[a] DWI charge is a quasi-criminal offense entitling the defendant to the protection of the confrontation clauses." State v. Berezansky, 386 N.J.Super. 84, 90 n. 4, 899 A.2d 306 (App.Div.2006). For that proposition, Berezansky cites Widmaier, supra, in which the Supreme Court considered a Fifth Amendment issue and concluded "that, at least for double jeopardy purposes under the United States and New Jersey's Constitution[s], a violation of the Implied Consent Law and a prosecution under the refusal statute must be regarded as quasi-criminal in nature." Widmaier, supra, 157 N.J. at 500, 724 A.2d 241.
To my knowledge, the New Jersey Supreme Court has not addressed whether the confrontation clause of our state constitution applies to DWI cases or quasi-criminal proceedings, despite lower court decisions to that end.[2] However, the *648 Court has extended certain protections to defendants charged with quasi-criminal offenses and declined to extend others on an issue-by-issue basis. See State v. Dively, 92 N.J. 573, 586, 458 A.2d 502 (1983) (extending double jeopardy protection to "Motor Vehicle violations tried in municipal court"); State v. Hrycak, 184 N.J. 351, 363, 877 A.2d 1209 (2005)(right to counsel exists in DWI cases); but see State v. Hamm, 121 N.J. 109, 577 A.2d 1259 (1990) (no right to jury trial in a DWI case).
On the other hand, the United States Supreme Court has not extended the full range of Sixth Amendment protections to "petty" and non-indictable offenses and has not spoken directly on the application of Crawford to matters that do not involve criminal prosecutions.[3] For example, the Court has held that at least the jury trial provision of the Sixth Amendment does not apply to quasi-criminal or petty offenses with maximum custodial sentences of six months or less. See, e.g., Lewis v. United States, 518 U.S. 322, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996); United States v. Nachtigal, 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) ("driving under the influence"); Blanton v. City of N. Las Vegas, 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989); Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Accord State v. Stanton, 176 N.J. 75, 820 A.2d 637 (2003); Hamm, supra, 121 N.J. at 128-30, 577 A.2d 1259.
Nevertheless, despite certain findings of co-extensivity, our Supreme Court has applied the state constitutional counterparts of the Federal Bill of Rights in ways that depart from federal precedent. For example, in State v. Tropea, 78 N.J. 309, 394 A.2d 355 (1978), the Supreme Court declined to decide whether the double jeopardy provision of the Fifth Amendment applied to a speeding prosecution[4] or to motor vehicle prosecutions generally. The Court concluded that "consideration of fundamental fairness militate[d] against any retrial in [the] case." Id. at 316, 394 A.2d 355. Similarly, in State v. Daniels, supra, the Supreme Court exercised its supervisory authority to prohibit attacks on a defendant's credibility in a criminal case by claims that he or she "tailored his [or her] testimony to meet the facts testified to by other witnesses[,]" notwithstanding that the Sixth Amendment did not require such protection. Daniels, supra, 182 N.J. at 85, 861 A.2d 808. Moreover, our Rule requiring counsel when there is a potential sentence of consequence or magnitude goes beyond what is required by the Sixth Amendment. See Scott v. Illinois, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979); Argersinger v. Hamlin, 407 U.S. 25, 30, 92 S.Ct. 2006, 2009, 32 L.Ed.2d 530, 535 (1972) (custodial sentence or loss of liberty required for assignment of counsel). See also Hrycak, supra, 184 N.J. at 363, 877 A.2d 1209 (right to counsel in DWI cases).
*649 Accordingly, it is not clear that the United States Supreme Court intended Crawford to apply to quasi-criminal or petty offenses or whether our Supreme Court will apply article I, paragraph 10 protection in this setting. After all, like the Sixth Amendment, article I, paragraph 10 of the New Jersey Constitution addresses the defendant's right "[i]n all criminal prosecutions[,]" and a DWI prosecution is not a "criminal" proceeding because of the statutory maximum to which a defendant can be sentenced upon conviction. See, e.g., State v. Ferretti, 189 N.J.Super. 578, 580-82, 461 A.2d 193 (Law Div.), certif. denied, 94 N.J. 606, 468 A.2d 238 (1983). See also N.J.S.A. 2C:1-4; Preserving Jurisdiction Under the Code, 7 Crim. Just. Q. 1 (1979).
Despite remaining questions over the breadth of the confrontation clauses, I am satisfied that our Supreme Court would apply Crawford and Davis to a DWI prosecution, even though driving while intoxicated is only a "petty" or quasi-criminal offense. This is particularly so because, in New Jersey, a DWI conviction is of sufficient magnitude to warrant application of the Crawford rule in such prosecutions as a matter of "fundamental fairness." Cf. Tropea, supra, 78 N.J. at 316, 394 A.2d 355. The Court's recognition of the elevated magnitude of a DWI conviction is demonstrated by the requirement that counsel must be provided to indigent defendants in DWI cases. Hrycak, supra, 184 N.J. at 363, 877 A.2d 1209; see Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216 (1971). See also Guidelines for Determination of Consequence of Magnitude, Pressler, Current N.J. Court Rules, Appendix to R. 7:3-2 at 2135-36 (2007). Further, plea bargaining is prohibited in DWI cases. See Guidelines for Operation of Plea Agreements in the Municipal Courts of New Jersey, Pressler, Current N.J. Court Rules, Appendix to Part VII at 2134-35 (2007). See also State v. Lanish, 103 N.J.Super. 441, 443, 247 A.2d 492 (App. Div.1968) ("A prosecution for drunken driving is in the nature of a quasi criminal proceeding and must be so conducted as to respect and safeguard the basic rights normally accorded one accused of a criminal offense"), aff'd o.b., 54 N.J. 93, 253 A.2d 545 (1969). I emphasize, however, that not all non-indictable, disorderly persons, or petty offense prosecutions need to be viewed in the same manner; nor do they all require the same treatment.
NOTES
[1] Because the issues in this case involve the constitutionality of a state statute, we invited the Attorney General to file a brief after the case had been briefed and argued by counsel of record. See R. 2:5-1; R. 4:28-4.
[2] Defendant did not testify at trial, so this party-opponent admission, see N.J.R.E. 803(b)(1), is unrefuted.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Although the parties' briefs and the transcripts sometimes describe Mr. Gallant as a "nurse," the documentation which Gallant filled out simply identifies his position/title as "PCA II," a job classification not defined in the record. For ease of reference, we shall likewise refer to Gallant at times as a nurse, recognizing that may not be his accurate title.
[5] N.J.S.A. 2A:62A-11, which was enacted in 1986, provides that "[a]ny person taking a specimen pursuant to Section 1 of this act shall, upon request, furnish to any law enforcement agency a certificate stating that the specimen was taken pursuant to Section 1 of this act and in a medically acceptable manner. The certificate shall be signed under oath before a notary public or other person empowered to take oaths and shall be admissible in any proceeding as evidence of the statements contained therein."
[6] The statute uses the term "certificate," see N.J.S.A. 2A:62A-11, while the exhibit in this case describes itself as a "certification." We use the terms here interchangeably.
[7] See N.J.S.A. 2A:62A-10.
[8] N.J.R.E. 804(a) provides that a declarant may be unavailable by reason of death, illness, privilege, persistent refusal to testify, lack of memory, or the proponent's inability to secure his or her attendance as a witness at trial.
[9] One of the two blood vials apparently tested at 0.104% blood alcohol concentration, as reflected on a worksheet prepared by "TD." Nonetheless, the State relied in its case upon the 0.103% figure, as the lower of the two readings.
[10] Prior to trial, defense counsel sought numerous items of discovery from the prosecutor. The request, which was embodied in a pretrial discovery order, included such items as the kit used in the defendant's blood extraction, the defendant's blood sampling consent form, the State Police lab protocol, operating manuals for the testing machinery, quality control records, gas chromatography spread sheets, and other items. After the prosecutor failed to supply these documents, defendant moved before trial to dismiss the summonses. The motion was carried to trial and ultimately the municipal judge denied the requested dismissal. However, it appears from the record that some of the requested discovery items, including the gas chromatography worksheets, were supplied before trial to defense counsel, who, in turn, supplied those documents to his expert.
[11] The stay of defendant's sentence has apparently continued.
[12] See e.g., State v. King, 213 Ariz. 632, 146 P.3d 1274, 1276 (App.2006) (applying the Crawford test to the admission of defendant's prior convictions at his drunk driving trial, but finding such court records were not testimonial); Belvin v. State, 922 So.2d 1046, 1050-54 (Fla.App. 4 Dist.), review granted, 928 So.2d 336 (Fla.2006) (applying the Crawford test to breath test affidavits measuring defendant's blood alcohol concentration, and reversing his conviction because such affidavits prepared by the examining technician are testimonial in nature); City of Las Vegas v. Walsh, 121 Nev. 899, 124 P.3d 203, 207-08 (2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1786, 164 L.Ed.2d 519 (2006) (applying Crawford to municipal court prosecution for drunk driving, and holding that a nurse's affidavit documenting her extraction of blood from defendant was testimonial); City of Cleveland v. Colon, 2007 Ohio 269, 2007 WL 179082 (Ohio Ct.App.2007) (applying Crawford to a victim's out-of-court statements admitted in a municipal prosecution for domestic violence, but finding they were non-testimonial because they were made to meet an ongoing emergency).
[13] See e.g., State v. Cummings, 184 N.J. 84, 89, 875 A.2d 906 (2005) (proof beyond a reasonable doubt); State v. Hrycak, 184 N.J. 351, 362, 877 A.2d 1209 (2005)(right to counsel); but see State v. Hamm, 121 N.J. 109, 129-30, 577 A.2d 1259 (1990) cert. denied, 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991) (rejecting claim that DWI defendants have a constitutional right to jury trial). However, we defer to our Supreme Court, which has frequently exercised administrative oversight of DWI prosecutions, in deciding whether the extant practice of enforcing confrontation rights in such proceedings remains necessary. In this regard, we fully join in the observations of our concurring colleague, who traces the development of Sixth Amendment and DWI jurisprudence in our State, and who rightly cautions that our opinion here should not necessarily be read to apply to hearsay documents presented in other non-indictable, disorderly persons or petty offense prosecutions.
[14] The exception covers "[a] statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy." N.J.R.E. 803(c)(6).
[15] At oral argument, the prosecutor revised his position, and urged that Berezansky be reconsidered by this panel, contending that the lab report was not the product of a "police interrogation."
[16] Indeed, we doubt that the police officer's DWI "kit" would contain any kind of substance with an alcoholic ingredient.
[17] We note that these arguments were advanced by the county prosecutor but were not addressed in the post-argument amicus submission of the Attorney General.
[18] See, e.g., United States v. Feliz, 467 F.3d 227, supplemental opinion at 201 Fed.Appx. 814 (2d Cir.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1323, ___ L.Ed.2d ___ (2007) (autopsy reports deemed non-testimonial); United States v. Ellis, 460 F.3d 920, 924-27 (7th Cir.2006) (blood test certifications prepared by medical professionals held non-testimonial because they were produced by "employees simply recording observations . . . in the ordinary course of business"); Neal v. State 281 Ga.App. 261, 635 S.E.2d 864 (2006) (declaring inspection certificates for breathalyzer machines non-testimonial); Jarrell v. State, 852 N.E.2d 1022, 1026 (Ind.Ct.App.2006) (breathalyzer inspection certificate not testimonial); State v. Fischer, 272 Neb. 963, 726 N.W.2d 176 (Neb.2007) (breathalyzer certificate not testimonial); State v. Craig, 110 Ohio St.3d 306, 853 N.E.2d 621, stay granted, 111 Ohio St.3d 1421, 855 N.E.2d 88 (2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1374, ___ L.Ed.2d ___ (2007) (autopsy report not testimonial).
[19] See, e.g., Thomas v. United States, 914 A.2d 1, 9 (D.C.App.2006) (finding that a DEA chemist's report was testimonial); Martin v. State, 936 So.2d 1190 (Fla.Dist.Ct.App.2006) (state laboratory report identifying seized substances as cocaine and marijuana deemed testimonial); Sobota v. State, 933 So.2d 1277 (Fla.Dist.Ct.App.2006) (state laboratory test of a blood sample taken from a suspected drunk driver held testimonial); State v. Miller, 208 Or.App. 424, 144 P.3d 1052 adhered to and reconsidered, 210 Or.App. 176, 149 P.3d 1251 (2006) (state lab report finding controlled dangerous substances in defendant's urine sample held testimonial).
[20] Pursuant to R. 1:36-3, we have refrained from citing to the vast and mounting number of unpublished opinions in courts across the nation on these post-Crawford subjects.
[21] See N.J. Const. of 1776 art. XVI. (stating that "all criminals shall be admitted to the same privileges of witnesses and counsel, as their prosecutors are or shall be entitled to"). In 1844, the State Constitution was revised to include a more explicit right of confrontation tracking the federal language of the Sixth Amendment of the Bill of Rights. See N.J. Const. of 1844 art. I, ¶ 8; see also John Bebout, Proceedings of the New Jersey Constitutional Convention of 1844 at 139 (1942). The drafters of our present constitution in 1947 left the text of the Confrontation Clause unaltered, placing it in renumbered Article 10. See II Proceedings of the New Jersey Constitutional Convention of 1947 at 1057 (1951).
[22] The Attorney General has highlighted this alarming trend with articles and statistics in his amicus brief. See, e.g., Karrie Ann Snyder, The Nursing Shortage in New Jersey and the United States: Suggestions for Future Research and Policy, at 4 (December 2006) (reporting that New Jersey had a 13% shortage for full-time equivalent registered nurses in 2000, compared with a 6% shortage nationally and projecting that shortage in New Jersey will rise to 25% by 2010, as compared with a 12% national shortage). The American Health Care Association has also recently reported a vacancy rate of 14.6% among licensed practical nurses. Id. at 12. See also Linda A. Johnson, Shortage of Nurses Putting Patients at Risk, Associated Press, March 29, 2004; Laurie Tarkan, N.Y. Times, Nursing Shortage Forces Hospitals to Cope Creatively, January 6, 2004. Defendant contends that the Attorney General has exaggerated the potential impact of this trend upon municipal court trials.
[23] We offer no opinion on whether such enactments would fall within the exclusive authority of the judiciary over matters of court procedure. See N.J. Const. art. VI, § 2, ¶ 3, see also Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406 (1950).
[24] We note that the amicus brief of the Attorney General particularly endorses the adoption of notice-demand procedures and videotaped depositions, measures that were also explored previously at oral argument. In his supplemental brief responding to the Attorney General, defendant contends that such formal measures are unnecessary, and that witness inconvenience issues can be resolved on a case-by-case basis through adjournments and other scheduling accommodations.
[1] We review the Law Division findings and conclusions on trial de novo. While the municipal court decided the case on the basis of "the State's certification as to the blood alcohol content," it did not conclude that the observations were insufficient to sustain the conviction, and the Law Division concluded that:

the combination of the Defendant's admissions, the physical indicia of intoxication he displayed, as well as his hostile behavior towards the police officer in the hospital establishes beyond a reasonable doubt that he was under the influence of alcohol when he drove his car off of the road.
[2] The Law Division has explicitly extended New Jersey's confrontation clause:

The Sixth Amendment applies to "criminal prosecutions." The right to confrontation of adverse witnesses guaranteed by Article 1, paragraph 10 of the New Jersey Constitution, likewise applies to "criminal prosecutions". State v. Ashford, 374 N.J.Super. 332, 338-39[, 864 A.2d 1122] (App.Div.2004). The criminal procedural guarantees of the New Jersey Constitution also extend to non-indictable, quasi-criminal prosecutions. Id. at 339 n. 6[, 864 A.2d 1122]. Such prosecutions would include those for disorderly persons offenses, [i]d. at 333, 339 n. 6[, 864 A.2d 1122]; as well as cases involving quasi-criminal charges such as DWI, State v. DiSomma, 262 N.J.Super. 375, 380[, 621 A.2d 55] (App.Div.1993); petty disorderly persons charges, State v. Avena, 281 N.J.Super. 327, 339[, 657 A.2d 883] (App.Div.1995) (parenthetical omitted); and municipal ordinance violation charges, State v. Carlson, 344 N.J.Super. 521, 527[, 782 A.2d 950] (App.Div.2001) (cases involving ordinance violations, commenced on municipal court summonses, are quasi-criminal matters).
[State v. Godshalk, 381 N.J.Super. 326, 331-32, 885 A.2d 969 (Law Div.2005).]
See also State v. Long, 266 N.J.Super. 716, 723, 630 A.2d 430 (Law Div.1993)(stating that a defendant has a Sixth Amendment right to confrontation in a municipal proceeding).
[3] The Sixth Amendment is expressly limited to "criminal prosecutions."
[4] As with New Jersey Constitution article I, paragraph 10 and the Sixth Amendment, the Court noted that article I, paragraph 11 of the New Jersey Constitution had "the same meaning and [was] coextensive in application" with the Fifth Amendment. Tropea, supra, 78 N.J. at 313 n. 2, 394 A.2d 355.